McClendon, j.
|2In this personal injury suit, a defendant/third-party plaintiff appeals a trial court’s grant of two motions for summary judgment in favor of two third-party defendants. For the following reasons, we affirm.
FACTS AND PROCEDURAL HISTORY
On July 1, 2014, Brendan Sharp, a 17-year-old employee of Redlron Construction, LLC (Redlron), was injured when a steel panel he was handling came into contact with, or in close proximity to, an overhead power line owned and operated by The City of Morgan City (Morgan City). Redlron was the subcontractor of Legacy Construction Services (Legacy). Legacy had been hired to build a commercial structure for Cummins Mid-South Diesel in Morgan City. Legacy subcontracted with Redlron to frame the building and install metal sheeting on the exterior.
On November 14, 2014, Brendan and his parents, Ray Sharp and Christine Andrews, filed a petition for damages, naming Morgan City as the sole defendant. Thereafter, Morgan City filed a third-party demand against Legacy and Redlron, seeking complete indemnity from Legacy and Redlron for their failure to follow Louisi *547 ana’s Overhead Power Line Safety Act (OPLSA), LSA-R.S. 45:141, et seq. In response, Legacy and Redlron each filed motions for summary judgment, arguing that all provisions of the OPLSA were complied with. Morgan City opposed the motions, asserting that issues of material fact existed as to whether Legacy and Redlron negotiated satisfactory mutual safety arrangements with Morgan City in connection with the work they were performing as required by the OPLSA.
The trial court heard arguments on July 29, 2016, and took the matter under advisement. On August 10, 2016, the trial court issued written Reasons for Judgment, finding that Legacy and Redlron were in full compliance with the OPLSA and that Morgan City was not entitled to indemnity for any damages or costs incurred as a result of the accident involving Brendan Sharp. On September 14, 2016, the trial court signed a judgment, granting the motions for summary judgment and dismissing Legacy and Redlron from the litigation. Morgan City then appealed.
1 «SUMMARY JUDGMENT
The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action, is favored, and shall be construed to accomplish these ends. LSA-C.C.P. art. 966A(2) (as amended by 2015 La. Acts, No. 422).[1] After an opportunity for adequate discovery, a motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966A(3) (as amended by 2015 La. Acts, No. 422).[2]
The burden of proof rests with the mover. Nevertheless, if the mover will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, the mover’s burden on the motion does not require him to negate all essential elements of the adverse party’s claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. The burden is on the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law. LSA-C.C.P. art. 966D(1) (as amended by 2015 La. Acts, No. 422).[3] When a motion for summary judgment is made and supported, an adverse party may not rest on the mere allegations or denials of his pleading, but his response must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him. LSA-C.C.P. art. 967B.
*548 In ruling on a motion for summary judgment, the trial court’s role is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. Hines v. Garrett, 04-0806 (La. 6/25/04), 876 So.2d 764, 765. A fact is material if it potentially ensures or precludes recovery, affects a litigant’s ultimate success, or determines the outcome of the legal dispute. A genuine issue is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for a trial on that issue and summary judgment is appropriate. Hines, 876 So.2d at 765-66.
Further, in determining whether summary judgment is appropriate, appellate courts review evidence de novo under the same criteria that govern the trial court’s determination of whether summary judgment is appropriate. In re Succession of Beard, 13-1717 (La.App. 1 Cir. 6/6/14), 147 So.3d 753, 759-60, Because the applicable substantive law determines materiality, whether a particular fact in dispute is material can be seen only in light of the substantive law applicable to the case. Jackson v. City of New Orleans, 12-2742 (La. 1/28/14), 144 So.3d 876, 882, cert. denied, — U.S. -, 135 S.Ct. 197, 190 L.Ed.2d 130 (2014).
DISCUSSION
The OPLSA sets forth clear statutory guidelines for persons working in the vicinity of high voltagé power lines.[4] Louisiana Revised Statutes 45:142 prohibits anyone from working within ten feet of any high voltage overhead line and provides:
No person shall, individually .or through an agent or employee, perform any function or activity upon any land, building, highway, waterway, or other premises, if at any time during the performance of any function or activity it is possible that the person performing the function or activity shall move or be 'placed within ten feet of any high voltage overhead line, or if it is-possible for any part of any tool, equipment, machinery, or material used, handled, or stored by such person to be brought within ten feet of any high voltage overhead line or conductor during .the performance of such function or activity,
An exception to this prohibition is found in LSA-R.S. 45:143, which provides, in pertinent part:
A. When any person desires to temporarily carry on any function,- activity, work, or operation in closer proximity to any high voltage overhead line than permitted by this Chapter, the. person or persons responsible for the work, to be done shall promptly notify, the owner or operator of the high voltage overhead line prior to the scheduled commencement of the work. Such notice shall be reasonable, considering the work to be done; however, the notice shall not be less than forty-eight | ¡¡hours prior to the scheduled commencement of the work, exclusive of holidays and weekends, except' in emergéncy situations that include police, fire, and rescue emergencies, in which case the noticé shall be made as soon as possible.
B. The work shall be performed only after satisfactory mutual arrangements have been negotiated between the owner or operator of the high voltage overhead lines and the person or persons responsible for the work to be done. The owner or operator of the lines shall initiate the agreed upon saféty arrangements within three working days and shall complete *549 the work promptly, subject to emergency weather conditions. Arrangements may include placement of temporary mechanical barriers separating and preventing contact between material, equipment, or persons and high voltage overhead lines; temporary deenergization and grounding; temporary location or raising of the lines; or by other means deemed appropriate by the owner or operator of the lines.
Additionally, LSA-R.S. 45:144A provides the liability for damages when there is a violation of the OPLSA:
If a violation of this Chapter results in physical or electrical contact with any high voltage overhead line, the person violating this Chapter shall be liable to the owner or operator of the high voltage overhead line for all damages, costs, or expenses incurred by the owner or operator as a result of the contact. .
The Louisiana Supreme Court has held that when a party is injured in an accident involving electrical power lines, the utility company that owns or operates the power lines may seek indemnification, even for the utility company’s own negligence, from violators of the OPLSA. Moreno v. Entergy Corp., 12-0097 (La. 12/4/12), 105 So.3d 40, 50.
In support of its motion for summary judgment, Legacy offered the deposition of Mark Broussard, the senior lineman for Morgan City. Redlron also submitted Mr. Broussard’s deposition, as well as excerpts from Brendan’s deposition.
Mr. Broussard testified that in May 2014 he got a call from the utilities director for Morgan City, Bill Cefalu, to meet with the contractor to discuss his concerns about the power line that was close to the commercial building being erected in Morgan City. Mr. Broussard stated that the contractor was ready to set the beams for the metal structure at the corner close to the high voltage overhead line, and the contractor was concerned that the power would jump to the building. Mr. Broussard testified that when he went out to the site, he got in the bucket lift and looked at the corner. Mr. Broussard then went through various options with the contractor. He stated that del «energizing the building was not feasible as there were too many customers that would be affected. Mr. Broussard testified that there were two options available, which were either “line hose” or “guy guards.” He did not think that a line hose, used to insulate the power line, would work because the weight of the hose would pull the line down so that it would make contact with the building.[5] Mr. Broussard testified that he explained that there was a seven foot, eleven inch vertical clearance and four foot horizontal clearance from the corner of the building to the overhead line. He further stated that it would take 34,000 volts of electricity to jump one centimeter and that the power line at issue was 7,620 volts. Mr. Brous-sard testified that he therefore made the decision not to use line hose, opting instead to use guy guards that were bright yellow, very visible eight foot long streamers hanging from the power line to give an indication of how far the line was from the building. Mr. Broussard testified that the contractor agreed with the guy guards and said he was okay with the seven foot, eleven inch clearance.[6]
*550 |7Mr. Broussard testified that once the agreement was reached, he installed the guy guards and used his bucket truck to raise up the line while the steel beams were installed at the corner in question.[7] Brendan also testified that the “streamers” were on the wire at the time of his accident.
We find that the evidence presented by Legacy and Redlron sufficiently pointed out the absence of factual support for an element essential to Morgan City’s claim, and the burden then shifted to Morgan City to produce factual support to establish the existence of a genuine issue of material fact. Morgan City would have the burden at trial to prove the existence of an OPLSA violation by Legacy and Redlron, which would obligate them to indemnify Morgan City for any damages, costs, or expenses payable to the plaintiff. In trying to establish a violation of the OPLSA, Morgan City introduced excerpts from the depositions of Brendan Sharp; Justin Waller, Redlron’s corporate representative and owner; Mr. Broussard; John Bracey, Herin, Legacy’s owner; and Dwayne Sis-trunk, Legacy’s superintendent.
Mr. Herin testified that when Redlron raised the issue of the high voltage overhead line to Legacy, he called Morgan City and was given Mr. Cefalu’s telephone number. Mr. Sistrunk told him that one corner of the building appeared to be close to the power line. Mr. Herin stated that he met with Mr. Broussard and Mr. Sistrunk at the building site. Mr. Broussard informed them that they could not do a line hose and assured them that power jumping to the building was not an issue. Mr. Herin stated that Mr. Sistrunk was not happy with the statement about the power not jumping and “didn’t feel safe.” That was when Mr. Broussard offered to help finish putting up the beams in the corner of the building, and after installing the guy guards, he used his bucket truck to lift the wire. When Mr. Broussard was asked if he discussed with the contractor the steel panels to be put on the exterior of the building after the completion of the framing, Mr. Broussard replied that the contractor did not talk about the panels.
lsMorgan City maintains that the language of LSA-R.S. 45:143 is clear and does not state that arrangements must be satisfactory only to the power line owner. *551 Rather, it argues that the OPLSA contemplates a bilateral, collaborative process between contractors and power line owners, and power line owners are not required to issue unilateral edicts to contractors dictating how their work must be performed. Morgan City contends that neither Legacy nor Redlron took any steps whatsoever to ensure that the safety arrangements offered by Morgan City were satisfactory. It asserts it presented sufficient evidence in opposition to the motions for summary judgment to establish numerous issues of material fact as to whether Legacy and Redlron “negotiated” “satisfactory mutual arrangements” with Morgan City prior to beginning the sheet metal siding work.
To the contrary, Legacy and Redlron argue that the OPLSA was complied with and Morgan City is not entitled to indemnity for any damages, costs, or expenses. They assert that Morgan City was notified prior to beginning any work within ten feet of the overhead power line and that no work was performed until after satisfactory mutual arrangements were negotiated and implemented. Thus, Legacy and Redl-ron contend that no material facts are in dispute, and Morgan City’s third-party demands were properly dismissed.
The issue presented in this appeal is whether Morgan City presented sufficient evidence to establish genuine issues of material fact as to whether a violation of the OPLSA occurred in this matter. In this regard, Morgan City averred that Legacy and Redlron failed to adequately inform Morgan City of the work to be performed, including the means and methods of construction and what equipment would be used; that Legacy and Redlron never consulted their own experts to determine whether the safety arrangement made was satisfactory; that Mr. Sistrunk gave conflicting- statements regarding his meeting with Mr. Broussard and the number of times he met with Mr.- Broussard; and that Redlron failed to follow its own safety procedures when hanging the metal sheeting on the exterior of the building. While Morgan City raised certain inconsistencies, we find that those issues of fact are not material. The inconsistencies |3and issues of fact asserted by Morgan City are not determinative of whether there was compliance with the OPLSA.
What the material facts do show is that Mr. Cefalu, the utilities director for Morgan City, was timely notified about the project prior to any work being done within ten feet of the high voltage overhead line, and he sent his senior lineman, Mr. Broussard, to work out arrangements with Legacy and Redlron. See LSA-R.S. 45:143A. Although the representatives of Legacy and Redlron, Mr. Herin and Mr. Sistrunk, questioned the use of the guy guards, they agreed to the arrangement deemed appropriate by Mr. Broussard. See LSA-R.S. 45:143B. Mr. Broussard installed the guy guards and work proceeded on the project. The guy guards were in place when the accident occurred and Brendan was injured.
The evidence presented by Morgan City fails to create a genuine issue of material fact as to whether an OPLSA violation occurred, an essential element of its claim. Therefore, upon our de novo review and based on the record before us, Legacy and Redlron were entitled to summary judgment as a matter of law.
CONCLUSION
' For the foregoing reasons, the trial court’s September 14, 2016 judgment granting the motions for summary judgment filed by the third-party defendants, Legacy Construction Services and Redl-ron Construction, LLC, is affirmed. Costs of this appeal in the amount of $2,727.50 *552 are assessed to the defendant and third-party plaintiff, City of Morgan City.
AFFIRMED.
Whipple, C.J. dissents for reasons assigned.

.Legacy filed its motion for summary judgment on December 21, 2015, and it is therefore governed by the version of LSA-C.C.P. art. 966 in effect after its amendment by 2014 La. Acts, No. 187. Article 966 was later amended by 2015 La. Acts, No, 422, and the provisions of Act No. 422 do not apply to any motion for summary judgment pending adjudication or appeal on the effective date of the act, January 1, 2016, See 2015 La. Acts, No. 422, § 2; Bouquet v. Williams, 16-0134 (La. App. 1 Cir. 10/28/16), 206 So.3d 232, 239 n.3, writs denied, 16-2077, 16-2082 (La. 1/9/17), 214 So.3d 871, 871. Redlron filed its motion for summary judgment on March 11, 2016, and it is governed by 2015 La. Acts No. 422.

. The 2015 Comments to LSA-C.C.P. art. 966 provide that subparagraphs A(2) and A(3) do not change the law.

. The 2015 Comments to LSA-C.C.P. art. 966 provide that subparagraph D(l) does not change the law.

. "High voltage” means a voltage in excess of six hundred volts between conductors, or between any conductor and the ground. LSA-R.S. 45:141(2).

. Mr. Broussard testified that line hose was put on the power line after the accident in this matter.

. When asked about the line hose Mr. Brous-sard stated:
A. Yeah. If they had called back and asked for it, yes, sir, it would have been done.
Q. You say it would have been done. But you had made the decision when you *550 first went out there not to put line hose on it. Correct?
A. After talking with the contractor and he said he was okay with that, yes, sir.
Q. So ya’ll reached an agreement—
A. Yes.
Q. —after discussing what was going to be done as to what would be appropriate to be done or not done?
A. Yes, sir,
* ⅜ ⅜
Q. So the clearance was seven .feet, six inches? Is that—
A. Eleven. Seven feet eleven inches.
Q. And that's from the building itself, correct?
A. Yes, sir.
Q. When you looked at that and discussed it with the contractor did you have any concern that even though there’s that much clearance from the building itself because there was going to be work with piece[s] of iron or whatever is involved with the construction of this building, the potential for such items could be closer to the power line than seven feet, eleven inches?
A. He acknowledged that he had seven foot, eleven inches of clearance and said he was good with that.
Q. And you were good with the fact that he was good with that?
A. Yes, sir.

. Mr. Broussard identified himself in a photograph, marked May 30, 2014, taken by another employee of Morgan City, showing him elevated in the basket of his bucket truck helping Redlron install the steel framing on the comer of the building closest to the power line.